[No. 27077. Department One. August 26, 1938.]

J. GORDON GOSE, *Appellant,* v. JOSEPH HARRIS, *Respondent.*[1]

*McMicken, Rupp & Schweppe,* for appellant.

*Bausman, Oldham & Jarvis* and *Stevenson & Gershon,* for respondent.

GERAGHTY, J.—This is an action to recover overdue installments on a note executed by the defendant. The note in issue is one of a large number of like notes executed by members of Herzl Congregation, a Jewish congregation in Seattle.

In 1929, the congregation, wishing to refinance its outstanding indebtedness, arranged to borrow sixty

[1]Reported in 82 P. (2d) 160.

thousand dollars from the West Coast Life Insurance Company by a mortgage upon its synagogue. As a condition to making the loan, the insurance company required that members of the congregation procure life insurance from the company in amounts aggregating seventy-five thousand dollars, under some plan of procedure to be agreed on.

An extensive campaign was undertaken by the officers of the congregation to secure subscriptions and applications for insurance from its members. Subscribers signed a subscription form for payment to a trustee of a specified sum, as well as a promissory note for the amount subscribed; the notes were payable in quarter, annual, or semi-annual installments over the period of ten years. The forms of subscription and note were on one sheet of paper, with a perforated line so that the note could be detached. The subscription and note signed by the defendant, for the payment of which this action was brought, follows:

"SUBSCRIPTION AGREEMENT.

"I, JOSEPH HARRIS, residing at Seattle in the State of Washington, hereby subscribe the sum of FIVE HUNDRED Dollars for the benefit of HERZL CONGREGATION, of Seattle, State of Washington, hereinafter called the ASSOCIATION, and will pay the same to NATIONAL BANK OF COMMERCE, designated as TRUSTEE in a Trust Agreement referred to in the Certificate on the reverse side hereof.

"This Subscription Agreement is made in consideration of other subscriptions and in further consideration of the issuance to me of a TRUSTEE'S CERTIFICATE for Five Hundred Dollars, substantially in the form of the specimen on the reverse side hereof.

"I authorize the TRUSTEE to make application for insurance on my life, in favor of said TRUSTEE, as Beneficiary on any plan agreed upon by and between the ASSOCIATION and WEST COAST LIFE INSURANCE COMPANY, the premiums on the policy to be paid by said TRUSTEE out of funds as provided in said Trust Agree-

ment, and I further agree to furnish the information required in the application for such insurance.

"I further agree that, in event I fail to pay this subscription forthwith in accordance with the terms of my Subscription Note, the said ASSOCIATION may (1) complete the payments on this subscription, in which event the ASSOCIATION shall be entitled to the proceeds of the policy insuring my life, and I shall have thereafter no interest therein nor in said TRUSTEE'S CERTIFICATE, or (2) said TRUSTEE may surrender said policy for the cash value thereunder, to be held by said TRUSTEE for the benefit of the ASSOCIATION under the terms of the Trust Agreement, without my consent or that of the Beneficiary named in said TRUSTEE'S CERTIFICATE.

"It is understood that if the application for insurance on my life be rejected by said Life Insurance Company, this subscription may be annulled by written notice from me to the TRUSTEE, and further obligation on my part hereunder shall thereby be discharged and my Subscription Note returned to me.

"I hereby designated CELIA HARRIS (relationship) wife, to be my Beneficiary in said TRUSTEE'S CERTIFICATE, with right to change the said Beneficiary from time to time.

"IN WITNESS WHEREOF, I have hereunto affixed my signature and signed and delivered the attached Note, the 11 day of Sept., 1929, at Seattle, State of Washington.                    JOS. HARRIS    (SEAL)
"WITNESS
   "M. KLATZKER

---

"SUBSCRIPTION NOTE

"FOR VALUE RECEIVED, I promise to pay to the order of NATIONAL BANK OF COMMERCE as TRUSTEE for HERZL CONGREGATION, at the office of said TRUSTEE at Seattle, the sum of Five Hundred and No/100 Dollars, in installments as follows:   Twelve and 50/100 Dollars on demand and

$12.50 on January 15, 1930
$12.50 on April 15, 1930
$12.50 on July 15, 1930

$12.50 on October 15, 1930 and
$12.50 quarter-annually thereafter 19—
until the total amount shall have been paid, or until
my death, should I die prior thereto.

"Presentment for payment and notice of non-payment are hereby waived.

"Dated at Seattle, State of Washington, this 15th day of October, 1929.

> "Jos. HARRIS  (SEAL)
> "Residence Address 525 79th Ave.
> "Telephone No. ——"

The defendant, after paying three installments of the note, refused to make any further payment, and the note was assigned by the trustee to the plaintiff for the purpose of collection.

While the defendant, in his answer to the complaint, interposed four affirmative defenses, only the first is material to our disposition of the case. It is alleged in the answer that the officers and agents of the congregation explained to the defendant that the congregation, being in need of funds, had worked out a plan with the insurance company under which all the congregation's friends would take out life insurance policies with the company; the policies to be issued would be fully paid up in ten years and payable to the owner or beneficiary after the expiration of a further period of three years; that the congregation would receive the benefit of the commissions on the policies and, also, would receive the difference between the face of the policy and the amount of premiums paid in should the insured die while the policy was in effect; that the policies to be issued would, in all respects, be similar to other ordinary insurance policies, and that there would not be any obligation to continue the payment of premiums during the entire life of the policy, but that, in the event the payment of premiums should be discontinued, the congregation would be entitled

to its cash surrender value if it wished to cancel the policy, or might itself assume payment upon the policy and become entitled to its face value at the end of ten years from the date of its issue; that, relying upon the truth of these representations, the defendant subscribed for a policy in the sum of five hundred dollars and paid a quarterly premium; that subsequently two other quarterly premiums were paid, when the defendant, for the first time, discovered that on the back of the subscription agreement was printed a clause providing for no repayment under the policy until May 1, 1969; and that these false statements and representations made by the congregation were known to the insurance company when it issued the policy, and were relied upon by the defendant.

The plaintiff, in his reply, alleged affirmatively that, at the time the defendant signed the note in controversy, the Herzl Congregation desired to borrow sixty thousand dollars from the insurance company; that the insurance company agreed to loan the money provided that the congregation would procure from its members subscriptions of money payable in installments over a period of ten years and in a total amount adequate to provide for retirement of the loan; that, as a condition to making the loan, the insurance company insisted that the subscription be procured in accordance with the following plan:

Subscriptions were to be solicited by the congregation and evidenced by a note similar to that signed by the defendant, payable to the National Bank of Commerce of Seattle, as trustee; that, as part of such subscriptions, all subscribers were to take out life insurance policies with the insurance company in an amount equal, in each case, to the sum of money subscribed, such policies to be payable to the trustee so that, in the event of death of the subscriber before completing pay-

ment of his entire subscription, the amount remaining unpaid thereon could be immediately collected by the trustee from the proceeds of the insurance, and the balance of the proceeds to be paid to a beneficiary designated by the subscriber.

The plan further provided that the trustee be charged with the duty of collecting all subscriptions and, from the sums so collected, should have the power and duty of paying to the insurance company the premiums on insurance taken by the subscribers, and also was to make payments toward the retirement of the money loaned to the congregation by the insurance company; that, as a further part of the plan, the subscriber, in the event he completed the payment upon his subscription, would be entitled to continue the insurance upon his life, which might, under the terms of the policy issued, mature as an endowment at the end of forty years.

That, upon this understanding and these terms, the Herzl Congregation inaugurated the campaign to procure subscriptions and procured subscriptions in an amount adequate to secure the loan from the insurance company; that the note executed by the defendant was given for a subscription made under this plan, which was fully explained to him.

The cause was tried to the court, sitting without a jury. The court found as facts:

"This subscription agreement and subscription note is contained on one sheet of paper and the defendant executed both at the same time on September 11, 1929. The execution of this Exhibit was procured by Martin Klatzker who was the agent for the West Coast Life Insurance Company and that said Klatzker and the Herzl Congregation, in order to induce the defendant to execute the same, represented to him that the Herzl Congregation was in need of funds; that with said Klatzker as representative of said life insurance company a plan had been worked out whereby members and

friends of the said Congregation would make subscriptions for the benefit of Herzl Congregation which would include premiums for life insurance policies with said insurance company providing for periodical payments of premium extending over a period of ten years, which payments would aggregate the face of the policies; that said policies would be fully paid in ten years and that the face amount thereof would be payable to the owner, in the event said payments were all made and in the event of the owner living, at the expiration of thirteen to fifteen years from the date of said policies; that in the event of the death of the owner prior to payment in full by him of his subscription and provided further said subscription payments were made, the amount so paid would be paid to a named beneficiary of the owner and the balance of said policy would be payable to said Congregation; that in the event the defendant did not desire to continue said payments he could do so without any further liability but with a forfeiture of all payments theretofore made by him and in which event he would have no further interest in said insurance and that the congregation could either secure the cash surrender value thereof or keep up the payments necessary to keep said insurance in force; that in case of default in any payments of said subscription or note there would be no further liability of any nature upon the defendant. When said representations were made to the defendant by said Klatzker and by the said Congregation, and each of them, said representations were known to be untrue but relying entirely upon such representations so made the defendant was induced to place his signature upon said subscription agreement and subscription note, being Exhibit I, and to pay the first payment thereon of $12.50 and thereafter the defendant made two other payments as specified in said Exhibit I of $12.50 each under the terms thereof.

### "III

"The defendant thereupon for the first time discovered that the policy of insurance or certificate representing the same did not mature in fact until May 1, 1969, and thereafter defendant refused to make any

further payments on account of said insurance or said subscription."

From these findings, the court concluded that the execution of the note sued on was induced by fraudulent misrepresentations; that the defendant had no further interest in the insurance policy represented by the trustee's certificate, and that the congregation is the beneficiary thereof; that the defendant has no right to the return of any payment made by him on his subscription, and, on the other hand, that the defendant is under no liability by reason of his failure to make his subscription payments. A judgment was accordingly entered dismissing the action, and the plaintiff appeals.

The appellant states the issue as follows:

"The primary question presented on this appeal is: Was the execution of the note procured by fraudulent representations as to the nature of the insurance policy to be procured upon respondent's life?

"Although this policy formed only a part of the consideration for the note, we shall assume it was a material part of the transaction, and, therefore, if fraud existed with respect thereto, the note would be unenforceable."

The trial court found that fraud existed. Our inquiry is whether this finding was warranted by the evidence.

We are somewhat in the dark as to the details of the policies procured by the trustee on the lives of the subscribers. The policy on respondent's life is not in the record, nor a copy of any of the other policies. Some expressions are found in the record implying that the transaction was in the nature of group insurance, but reference is made to policies in units of five hundred dollars, with provision for the subdivision of units into halves and quarters, that is to say, coverages as small as $125 and $250. The policies on the lives of the subscribers were written in favor of the trustee. The

trustee, in turn, gave to the individual subscriber a certificate evidencing his interest in the policy held by the trustee.

The subscription agreement authorized the trustee to make application for life insurance on the life of a subscriber and recited that the premiums on the policies were to be paid by the trustee out of funds as provided in the trust agreement. While the respondent's subscription was made September 11, 1929, the trust agreement found in the record was not executed until December 9th following. The certificate issued to the subscriber recited that the trustee

" . . . holds under the terms of said agreement and the subscription of the OWNER a Ten (10) Year Modified Non-Participating Forty-Year Endowment Life Insurance Policy on the life of the OWNER for the face amount of ................................. Dollars, issued by WEST COAST LIFE INSURANCE COMPANY, of San Francisco, California, and made payable to said TRUSTEE.

"The TRUSTEE agrees to disburse the proceeds of said life insurance policy as follows:

"FIRST: Should the INSURED and the OWNER of this certificate die prior to the completion of the payments due under the terms of said Subscription Agreement the sum of ................................. Dollars, less the total amount unpaid under the terms of said subscription, will be paid, after receipt of due proofs of death, out· of the proceeds of said policy, if and as received from WEST COAST LIFE INSURANCE COMPANY, to ................................., beneficiary under this certificate.

"SECOND: Should the INSURED and the OWNER of this certificate have fully paid such subscription and be living on the ................. day of ................., 19........, said OWNER will receive ................................. Dollars; or should said OWNER die prior thereto but after having fully paid the amount of said subscription, after the receipt of due proofs of death, ................................. Dollars will be paid from the proceeds of said policy of life insurance, if and as the funds shall be received from WEST COAST LIFE INSURANCE COMPANY, to said beneficiary under the certificate.

"The payment of the premiums on said life insurance policy is secured by, and this certificate is issued subject to, the terms, covenants and conditions of the Trust Agreement hereinabove referred to and hereby made a part hereof, and this certificate shall become void in event of default of the payment of any installment of the Note executed pursuant to said subscription."

As the trust was not in existence at the time of the respondent's subscription, he did not then receive a certificate. He testified that he never received his certificate, but a copy of a proposed certificate, in substantially the same terms as those afterwards issued, was printed on the back of the subscription paper.

According to the testimony of witness Martin B. Klatzker, policies of life insurance issued upon the ten-year modified non-participating forty-year endowment plan carry a reduced rate of premium for the first ten years, and in the eleventh year, the premium increases to the normal rate, which continues until the policy matures in cash as an endowment; that is to say, a policy written September 11, 1929, the date of the respondent's subscription, would not mature until September 11, 1969, if the insured lived to that date. Witness Klatzker also testified that, during the first ten years, this type of insurance could be carried for a comparatively small part of the sum subscribed by the insured; that it would cost only from twenty to twenty-five per cent of the subscription.

Klatzker, as agent of the insurance company, took an active part in procuring subscriptions to the congregation's plan of financing. The respondent testified:

"Mr. Klatzker came over to me and told me distinctly 'You will take out the policy for ten years, ten years' payments, and after the ten years are up three years later you will get your full amount of money.' Another thing I asked Mr. Klatzker was this: I said, 'Suppose if I will take this policy and, whatever will

happen, I would not like it or I would not be able to pay, what is going to be the result?' He said, 'The only thing you are going to do is lose the money you pay in and all clear like any of the rest of your policies you been taking out before, prior.' "

The respondent also testified that he could not read or write the English language. He testified that he discovered that the policy would not mature for forty years after he had made the third quarterly payment.

"That is the reason that I stopped that right away when I found it out instead of the way they told me that it was a ten year policy and after three years later I would get the full amount, and I find out instead of ten years what I do call a fake, that is forty years, and after that there was a change in the Congregation and I told them distinctly—I sent in my resignation as a member right away and I told them distinctly I have no more to do with this Congregation entirely because I brought up real orthodox and I going to remain up to my end."

After several other subscribers, called by the respondent, had given similar testimony, it was stipulated that the respondent could call a number of other witnesses whose testimony would be substantially the same as that given by the witnesses who had just taken the stand for respondent.

Mr. Carl Rubinstein, a member of the congregation and its president in 1929, called by appellant, testified:

"At that time the Congregation was substantially in debt and desired a loan from anybody who was willing to loan us money. Eventually we got it from the West Coast Life Insurance Company. They had a plan of refinancing, under which we would sell insurance to our members. . . .

"All the people who took out insurance knew what it was for. We explained it to them at meetings of all kinds. The statement that I told people that they could quit making payments at any time is an impossible one. I told them that the plan runs forty years,

but I said that if anybody needed his money badly, the synagogue would pass a resolution to pay such a person back in ten or fifteen years. I don't remember exactly how it was. According to this plan, if everybody paid, the synagogue would be paid for and we would have a free building, and then if a few people needed their money badly, we would pay them. I told them that the only time the insurance money would be paid would be when a man dies and his family would get back what he had paid in, and that if he lived he would have to wait until the policy expired.

"The promise that the Congregation would pay back the money was based upon the idea that all these people would pay their subscriptions.

"In addition to explaining the plan at the meetings, we talked to a majority of the people personally. I never told Mr. Harris that he could drop his payments any time he wanted to. If that were true, he might as well drop it in the beginning. I never heard Mr. Klatzker say anything of that sort.

"In order to get the loan from the West Coast Life Insurance Company we had to have $75,000 worth of insurance."

This witness testified that, in addition to the life insurance subscriptions, a mortgage on the synagogue was given to the insurance company as security for the loan of·sixty thousand dollars, and that it still holds this mortgage.

Martin B. Klatzker, the agent of the insurance company, further testified:

"I never told any of these people that the West Coast Life Insurance Company would return the money on their policies at the end of fifteen years or that they might drop making payments at any time. Originally the insurance was not mentioned to any extent. Later on, when trustee's certificates were being received, questions arose regarding the insurance. The officers then asked me about the plan, and we had figures showing that the plan could work out in a period of from thirteen to fifteen years, provided that all payments were made, and provided that interest could be

earned at five per cent upon the funds of the Congregation. Under such circumstances the Congregation could pay off the existing policies. That would be a payment by the Congregation, however, and not by the West Coast Life.

"If all the payments had come in regularly, there would at the end of ten years be a certain amount in the trustee's hands. All of the life insurance policies have a cash value after the first year, and the cash value at the end of fifteen years, plus the cash in the trustee's hands, plus interest on this cash at five per cent, and plus some additional contribution by the Congregation, would have made payment possible at the end of thirteen years. This matter was discussed in March, 1930, seven months or so after the subscriptions had been taken. This idea was communicated to the Congregation, which in turn sent out a letter stating the general facts as to these calculations.

"It now appears impossible to return the moneys to the subscribers at the end of fifteen years, because it is impossible to earn five per cent on money now, and the payments on the subscriptions have not been made, and the trustee's funds are practically nil. We now have difficulty getting money enough to carry the premiums on the insurance.

"I never represented the policies to be anything other than ten-year modified forty-year endowment policies."

The record contains a letter, dated February 6, 1930, addressed by the president and secretary of the congregation to the members, in which reference is made to the fact that the insurance deal and the refinancing of the building had been completed, and continues:

"Plans are being made to reduce the period of endowment on these insurance certificates, so that the members and subscribers can get their money back in a few years."

A reading of the record leaves the impression that the promoters of the insurance plan had but a hazy conception of its realities. Respondent and his wit-

nesses testified that there was an express promise that the policies would be paid in thirteen or fifteen years. Mr. Rubinstein and Mr. Klatzker, while denying this promise and stressing its impossibility of fulfillment, nevertheless speak of possible payment within that time if the plan were carried out. A notion seems to have existed that, by some magic inhering in the insurance plan, money could be conjured out of the air, making it possible to pay off the congregation's loan of sixty thousand dollars and to mature the seventy-five thousand dollars of insurance, representing the subscriptions, within some indefinite period materially shorter than that stated in the certificate.

It is true that the letter of February 6, 1930, was written by Mr. Rubinstein several months after respondent had made his subscription, and that Mr. Klatzker testified his plan for early repayment was discussed after the subscription. But the respondent's witnesses testified positively that similar representations were made to subscribers before making subscription. In interpreting the insurance plan, the appellant states in his brief:

"All the policies of insurance were 10-year modified 40-year endowment policies. The expression '10-year modified,' as used with respect to life insurance, means that during the first ten years a low rate of premium is paid, and thereafter the amount increases. The 40-year endowment feature, of course, means that after paying the premium forty years the policy matures as an endowment, having in the meantime provided for payment in the event of the insured's death. At the end of the 10-year period the subscriber should have had his subscription paid in full, and would then be entitled to take over the policy as his own, and either surrender it for its then cash value or continue to pay the premiums, keeping the policy in force and maturing it as an endowment at the end of the 40-year period, if he survived to that time. Under the plan above outlined some $75,000 in subscriptions and an

equivalent amount in insurance was procured from the members of the congregation."

The plan as thus explained would be understandable. Under it, at the end of ten years, the subscribers would have paid seventy-five thousand dollars into the trust fund. This might have enabled the trustee to pay the low premium rate chargeable for the first ten years on the seventy-five thousand dollars of life insurance and have enough left to pay off the mortgage. When this happened, the congregation would be free to wash its hands of the insurance, and each subscriber, if he wished to have its benefit, would be required to pay the premiums himself to maturity.

But nothing is said in the subscription paper, the trustee's certificate, or the trust agreement, informing the subscriber that, after ten years, he was to carry on the policy at his own expense. On the contrary, these documents leave the impression that, after a subscriber had paid the full amount of his subscription, the policy would be paid to maturity by the trustee. The subscriber was assured of a certificate representing insurance, conditioned only on his paying in the amount of his subscription. The subscription agreement recites:

"I authorize the TRUSTEE to make application for insurance on my life in favor of said TRUSTEE, as Beneficiary, on any plan agreed upon by and between the ASSOCIATION and WEST COAST LIFE INSURANCE COMPANY, the premiums on the policy to be paid by said TRUSTEE out of funds as provided in said Trust Agreement, . . ."

The obligation of the subscriber to this fund was the payment of the amount of his subscription. The trustee's certificate issued to the subscriber recites that the trustee holds, under terms of the trust agreement and subscription, a policy payable on the life of owner.

The certificate also contains the trustee's agreement, first, that, should the owner die before completion of payments due under the subscription, it will pay the amount of insurance, less the unpaid subscription, to the beneficiary; and, second, that, *should the insured and owner of the certificate have paid such subscription* and be living at the maturity of the policy, the proceeds will be paid to the owner. There is no qualification or condition requiring payment by the subscriber of more than his subscription in order to entitle him or his beneficiary to the benefits of the policy. Section 5 of the trust agreement provides that

"The Trustee shall, at the expiration of the endowment period, or upon prior death of a certificate holder, disburse the funds received under the policy in accordance with the terms of such certificate."

Section 8 of the same agreement recites that, should the congregation at any time deem it to be expedient or advisable, it may provide for the payment of, and direct the trustee to pay, all premiums required to mature life insurance policies at such time in force, in advance, and, when such premiums shall have been paid, the balance of the fund in possession of the trustee is to be disbursed upon order of the officers of the congregation.

█ We are of the opinion that, upon the record, the court was warranted in finding that the conditions of the policy were misrepresented to the respondent. In reaching this opinion, we are not unmindful of the rule that parties are charged with a duty to read contracts to which they subscribe; but, giving full effect to the rule, the transactions involved were so complex that a person of ordinary intelligence could not understand them without interpretation. The appellant relied on the interpretation of them given by the agent of the

insurance company and officers of the congregation, which, as the court found, was misleading.

Our conclusion on this head makes it unnecessary to discuss any other question raised by appellant's assignments.

The judgment is affirmed.

Main, Holcomb, and Simpson, JJ., concur.

Steinert, C. J. (dissenting)—The primary purpose of the plan of insurance involved in this action was to secure a loan to Herzl Congregation, to be paid off through a form of subscription by its various members, so that, at the end of ten years, the congregation would own its synagogue free of debt. Obviously, the payment of the subscriptions in full would not be sufficient to satisfy a sixty thousand dollar mortgage indebtedness and at the same time procure fully paid-up policies of insurance for the subscribers in the sum of seventy-five thousand dollars. To effect both purposes would, as suggested in the majority opinion, require that, "by some magic inhering in the insurance plan, money could be conjured out of the air." Respondent was a business man, operating a meat market, and I find nothing to indicate that he was susceptible to magic or believed in magical returns from insurance.

The primary question in the case is whether respondent was defrauded through misrepresentations made to him as to the nature of the insurance policy. Fraud must be established by evidence that is clear, cogent, and convincing. It may be that respondent did not fully comprehend all the details included in the plan by which the mortgage loan was to be effected. It may be, as the majority states, that "the promoters of the insurance plan had but a hazy conception of its realities." But mere lack of complete understanding, or even a misunderstanding, of details, is not sufficient

basis, under the circumstances here presented, for a finding of fraud. The parties concerned in the fruition of the particular plan were not dealing with each other with the idea of personal financial profit to themselves. They were mutually and primarily interested in formulating some plan by which they could preserve and retain the synagogue which they themselves or their predecessors had built. It was a worthy cause, involving mutual assistance and contribution.

The real reason for respondent's repudiation of his contract, as I read the record, is that, during the subscription campaign, a schism arose among the members regarding the doctrines of the congregation.

Herzl Congregation had at one time subscribed to the doctrines of orthodox Judaism. During the period of the campaign, a majority of its members converted it into what is termed a "Conservative Congregation." The difference between the two types of religion appears to be very distinct and substantial. This radical change of doctrine resulted in much bitterness of feeling among the members. The dissenting minority, of which respondent was one, being greatly dissatisfied with the turn of events, withdrew from the congregation and joined another of the orthodox type. Immediately thereafter, respondent stopped payment upon his subscription. His loyalty to his particular preference of religion may well be respected, and his right to withdraw from the congregation cannot be denied. But his obligations, voluntarily assumed, cannot thus be dissolved, nor can his charge of fraud against those whom he had abandoned be thus substantiated.

I dissent.